We'll hear the next case, Nadia Market v. United States. Solis Dosa Facit Venemon. The dose makes the poison. The alleged poison in this case is a fraud that's been alleged by the government. But what we have as far as the evidence goes are just innocuous droplets of water like we're experiencing today outside. The only poison is the violent sith that is 7 USC 2021 A2 which calls, which might be a content-based regulation. But as it's enforced, it's arbitrarily enforced. What about the evidence of the patterns of transactions, you know, repeat rapid transactions showing the same household, the high dollar value given Nadia market size and inventory, the comparisons to similar markets in the area? I can address all those questions without a problem. I can tell you first and foremost, it seems one of the, you know, according to the administrative record, the decision, they were saying that this is a quote-unquote a typical grocery store. First and foremost, they don't present any evidence of what a typical grocery store is. And this is not, you know, we're in Vermont, you know, we believe in this, we believe in the system of farm-to-table. It's very important to us to be organic. And this data that they keep saying is inept, it's inadequate. And I'll tell you, it's a donut. And the donut is they're complying data without having a significant portion, or we don't know if it's significant, insignificant, and that's the farmer's market. So the 7 USC 2021 gives you the regulations for this enforcement when it comes to food stamps. But the problem becomes part of the evidence they can use is yes, data compilation. We don't disagree that that's what the statute says, or the regulation says. I'm sorry, it's not a statute, the regulation. But the problem is the data is not complete. So now you have a business that is catered toward minorities, and just because they're not in the farmer's market, which, you know, arbitrarily or not, does not usually, you know, support the businesses that we're supporting. And then you have a data that ignores all that, and then we plausibly allege discrimination. I mean, I know you say it, but do you show that farmers markets are owned by whites and that your kind of market is the equivalent of it, but owned by minorities due to any of the things that are necessary for an argument of discrimination? You know, this, it's not about discrimination. It's about the arbitrary enforcement. And there is the discriminatory practice becomes, we don't know, you know, that's the problem. The data is giving us... Arbitrary enforcement requires really a much, you know, for us to say that they are arbitrary, it has to be something that makes no sense at all. Discrimination is something we can step into more so that you have a much harder time if you're just saying arbitrary enforcement, don't you? I agree, but you know, it's part of the totality of circumstances for us about why this administrative decision is just flawed, and it is violating a due process violation, which is a... Did you allege discrimination below? Well, we alleged that there was, that the due process was violated, and that the discrimination comes in from the fact that we're only data complying with certain businesses. And that's discriminatory. It has a discriminatory effect. That's just a reality. I mean, we are dealing with a situation where some businesses will get audited and some won't, essentially. Are you making an argument about the burden of proof? Because what you were saying before, about what evidence there was, it was not, would be stronger if you could say it was the government's burden to show that this was a violation when they had these things, as against what most other courts have held, that the burden is on you. And that, I don't know that we have any decision of our court on, but perhaps if you addressed that, that might be . . . The problem becomes for us is that we shouldn't have the burden of proof. I mean, this is a due process violation, and the due process requires that we do not have the burden of proof. We are taking away somebody's life, liberty, or pursuit of happiness, specifically life and, you know, the pursuit of happiness, including the freedom to choose the way you want to spend your electronic benefits transfer, your food stamps. You know, we also believe that that's an expression protected under the First Amendment. That's another issue in itself. But we shouldn't have the burden of proof. That's not what, that's not what the seven U.S.C.s want. Let me ask you a more technical question. Sure. In . . . did you dispute any of the government's 56.1 statement? Yeah. Yes, we did. We specifically filed an objections to 4 and 6, and we . . . and can I just go back? You know, the government keeps claiming that there were no objections. That is . . . that is very inaccurate, because from the beginning at the administrative level, we never had . . . they got our objections, even though we were not the attorneys at the point. They got the objections from the store owner saying, look, these are ledgers. These are people that we've given credit to. So, 4 is that the FNS maintains a national database of all EBT transactions, and 6 is that the alert system identifies statistically unusual EBT transactions. Those are the two things that you disputed. No. Oh, I'm sorry. Those are in addition, but the biggest things we disputed were that, A, the compilation of the farmer's market was not taken into consideration, and we also disputed that these were trafficking, because we keep trying to tell this was from the beginning. We've always stated that these were not trafficking transactions. Unusual transactions are easily explained, because we were giving ledger credit. Did you dispute the accuracy of the transaction reports? Well, this is where we were working in a vacuum. We don't know the exact household, and I don't know how we would go about determining exactly when these numbers came up. I mean, all these numbers to us . . . The answer to Judge Chin's question is no. Did we . . . You didn't know, but you didn't . . . No, we didn't dispute. I mean, we don't dispute that the numbers are there. Numbers are numbers. I mean, if I say the number 5, it doesn't mean anything . . . You're not disputing the numbers. You are saying that somehow the way they get these numbers is procedurally unfair? Thank you. So succinctly said. That's an interesting, a hard argument. It is. Well, we didn't expect this to be . . . That has to be the argument you're making. Well, it is. I mean, that's part of it, but I mean, it's more than one. As I said, we have the discriminatory effect, and we have a process that is not allowing someone to protect their due process rights. It's shifting the burden of proof, and it's asking minorities . . . When they give explanations, it's being completely ignored. We have never had what I . . . You know, one thing I learned, if you're ever in default, you always say one thing, confrontation clause. You know, we've never had the opportunity to look at any witnesses. Counsel, do you have any cases that have raised this question of procedural unfairness of a process with your consultants? I don't know. We've cited many cases, but . . . Perhaps you could look and tell us on rebuttal. I can, probably, if I . . . Thank you. We'll hear from the government. Good morning, Your Honors. My name is Melissa Rinaldo. I'm an Assistant United States Attorney for the District of Vermont. This is a food stamp case, now known as a SNAP case, and the decision of the District Court should be affirmed here, because the District Court conducted a de novo review of all the evidence, including post-hearing evidence submitted by Nadia Market, and properly concluded that there was no dispute as to any material fact, and that it is more likely true than not true that Nadia had traffic and SNAP benefits. And therefore, the Court properly found that Nadia had failed to meet its burden of proving by a preponderance of the evidence. Do you think that she would prevail even if you had the burden? Your Honor, yes, I do, because . . . Why is that? In this case, there was no dispute about the reports. The trafficking evidence is strong, and it's undisputed. The five areas that the government found where there were anomalies were clear. There were repeated, inexplicable evidence. Well, their argument against that is that if you looked at farmers' markets, and they are more like farmers' markets, in the same way, you would find analogous problems. And that may not suffice to meet if it is their burden, but it may say that it may raise at least a question of fact if it is your burden, and I'd like you to answer why that is not so. Well, first of all, Your Honor, there is no evidence in the record whatsoever to establish that this market acts as a farmers' market. When farmers' markets are dealing with local produce, local food, and there are tokens that when someone who has EBT benefits purchases tokens to use at a farmers' market, they do that. But . . . So you say that that isn't a relevant question anyway? Correct. That's correct, Your Honor. There are no comparators that farmers' markets . . . That's correct, Your Honor. This is an urban store. Vermont has a lot of rural areas, but this area is an urban area. This is right outside the city of Burlington. Winooski itself is a city. There are 21 or 22 markets, or not markets, but stores in that one or two-mile radius of this store where an EBT beneficiary can use their SNAP benefits. So this is more an urban setting. And when you look at the data that the government compiled with respect to the redemption behavior at other stores in comparison to Nadia Market, Nadia Market is off the charts. There are, I think, $16,000 worth of redemptions as opposed to $5,000 at a very similar store selling similar food, similar size, in the same period of time. So the evidence itself, which is uncontroverted, is strong in this case that there was trafficking going on. And the government uses all of the EBT data that it receives from all of the households throughout the country. And there are a lot of states that are similar to Vermont. And so all of the data that is used is compiled and analyzed. And the government is allowed by statute to use this data to find and evaluate the anomalies and to find where there are unexplained patterns. But that's not all we have. So your argument is that even if the burden is on the government, this data is sufficiently uncontroverted so that it doesn't really matter. The burden has to have been met. That's correct. And we don't just have this data, this electronic data. What we also have here is an interview with the store owner's son-in-law, who was one of the clerks who testified that, contradictory to how the owner presented his case to the agency, when he was interviewed, the store clerk said that we don't allow people to buy things on credit and we don't round up. Now, that's completely opposite. We got probably a 50-page ledger from the owner once he was trying to explain all of this anomalous activity. We get a 50-page ledger of supposed credit transactions. And so the store owner has written this down and supposedly knows which one of his customers is buying on credit. So it's just — it misstates the record to say that the store owner doesn't know who these households are. Counsel, at the end of their argument, opposing counsel said that the procedure the government uses is an unfair procedure because it doesn't allow them to question what is going on and that that is — I don't know if that argument was made below or whether it was forfeited or not, but could you address that question? Because that seemed to me an interesting argument that I hadn't really seen before. There were some portions of that — there was a due process allegation below, but there are at least two courts, the Ibrahim case and the Redmond case, that were decided — I believe both were circuit court decisions — and both said that the process provided here by the statute suffices for due process. It — and in this case, the store owner clearly had numerous opportunities before the agency to present documentation and to explain if these aren't trafficking — Is there an opportunity for a store owner to take the deposition of — Yes. There is that opportunity? It's not before the agency, but the process involved here is there's a process before the agency, and then once the agency decision is made, the store owner has the opportunity to challenge that in court by filing a complaint, and that's what the plaintiff did here. Once you're in court, is there the ability to take deposition? Absolutely. There's — Was a request made here for deposition? None whatsoever. Plaintiff did no discovery whatsoever. I received no discovery requests. There were no deposition requests. We should assess these due process concerns in the context of both the agency action and the district court process. Correct. The district court is required to conduct a de novo review of all of the evidence and not just accept — this isn't a record review case. But there was a period for — allowed for discovery. Absolutely. And — Did the government seek any discovery? No, we did not. So neither side sought any? We did not seek any discovery because we felt that the evidence was sufficient. Neither side sought discovery? Correct. And when you said it's circuit court cases, what circuits? The Redmond case was from the Fifth Circuit, Your Honor. The Ibrahim case — I don't have that They're persuasive but not binding. Correct. And also, back to Your Honor's point about the burden of proof, that's correct. The Second Circuit has not ruled on the issue of who has the burden of proof in this case. But the statute and numerous courts, circuit courts from throughout the country as well as several lower courts in this circuit, the Western District of New York in 1997 in the Hernandez case, and then the — just this past fall, September of 2016, the Duchemaza case out of the District of Connecticut. Those cases — in addition, the Fifth Circuit in the Redmond case, the Seventh Circuit in the Fells case, the Ninth Circuit in the Kim case, the Sixth Circuit in the Warren case — those cases have all held that the burden of proof — the statute puts the burden of proof on the plaintiff, the aggrieved store owner, by requiring him to be the plaintiff. But you told me — you told me earlier, of course, that in this case it doesn't really matter. I think the evidence is strong enough in this case that it doesn't matter, Your Honor. That doesn't change the fact that the burden of proof is still on the plaintiff to prove their case and every single element of its case. Thank you. If the Court has no further questions — Thank you. Thank you very much. We'll hear rebuttal. You know, they keep talking about normal. Nobody came in as an expert to say what a normal business is. And it seems, as I listen to the government once again, they are upset by the fact that my client is more successful than their neighbor. Why isn't a look at the other 21 stores in the area of comparable size — why doesn't that tell us what normal is? I'll tell you why. I'm sitting here and standing here in front of you. But you know what? My clients could have gotten — there's 50, 100 other lawyers in a block of where I work, okay? They chose me. There's a reason I choose to go to a certain store,  and sometimes maybe I want to pay a dollar. Taking the numbers as a whole, what, I don't recall, 16,000 versus 5,000 average, doesn't that tell us something? No. You know why? Because who said it? The government said it. I didn't have an expert. I didn't have somebody coming in and say, you know, I've done a data analysis of all the stores — I would necessarily just indicate to us that you had an opportunity. No, you know, I completely disagree with that. The problem is this decision was rendered on the administrative level. A, we were not involved. B, the problem — Well, but this was argued again de novo before the court, and you could have gotten depositions. You could have gotten discovery. You could have shown that there were reasons why these other stores were not apt to be, were not appropriate. All that could have been done. I don't understand how that's not a fundamental due process violation on my client's behalf. When I have to go around asking other grocery stores — How is it a due process violation when you have the opportunity to ask for a deposition from the government to have someone so you can question about the data, and you don't do so? Because you're depriving me of a life, liberty, and pursuit of happiness, and I don't know why I have — Why do I have to prove to you that I'm — That happens any time there is a penalty. And the question is, when they deprive you, when they impose a penalty, have you a process that can make sure that the penalty was appropriately assigned? And if you take part in that process, we can then say the process was adequate or not, the findings were adequate or not. But it's rather difficult for us to say that you were deprived something improperly when you take no advantage of the ways there are to question it. Well, I think we took the complete advantage because we repeatedly said that these ledgers explain we extend credit, and that's why the numbers of the transactions were so bulky, because we would wait until their EBT cards were resupplied. Can I — And one final argument. The government talks about how they interviewed the clerk. Let's just get something straight. Every person that works in that store is not fluent in English. The questions that were asked by this person who went on site, first of all, doesn't even live in Vermont, does not know the local businesses, comes from Virginia, and all of a sudden is telling my Iraqi client, hey, your answers don't match. We don't even know if they understood the questions. Thank you, judges. I would like to say, I understand why everybody here is magna cum laude. Thank you. Well-reserved decision.